IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROBIN Y. UYESHIRO and DONNA Y.L. LEONG, | ) Civ. No. 13-00043 ACK-BMK |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| IRONGATE AZREP BW LLC, a Delaware limited liability company, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT IRONGATE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

For the following reasons, the Court hereby GRANTS IN PART AND DENIES IN PART Irongate's Motion to Dismiss (Dkt. No. 40). The Court DENIES the motion as to Plaintiffs' claim for unjust enrichment. The Court GRANTS the motion as to all of the remaining claims[1] in the First Amended Complaint; those claims are DISMISSED WITHOUT PREJUDICE.

---

[1] The Plaintiffs' second claim for relief, a claim for breach of contract, is pled in the alternative to the Plaintiffs' claim for unjust enrichment. To the extent the Plaintiffs state a claim for unjust enrichment based on their allegation that the Sales Contract is void due to a lack of mutual assent, the breach of contract claim appears to be moot. Regardless, for the reasons stated in this Order, the Court finds that, even assuming the Sales Contract is valid, the Plaintiffs fail to state a viable claim for breach of contract.

**PROCEDURAL BACKGROUND**

Plaintiffs Robin Y. Uyeshiro and Donna Y.L. Leong filed their Complaint in state court on December 31, 2012. (Dkt. No. 1, Ex. 1.) On January 28, 2013, Defendant Irongate Azrep BW LLC removed the action to this Court, citing both federal question and diversity jurisdiction. (Dkt. No. 1.)

Irongate filed a Motion To Dismiss the Complaint on February 19, 2013. (Dkt. No. 6.) The Court granted the motion on September 13, 2013,[2/] dismissing Plaintiff's Complaint without prejudice, except as to Plaintiffs' claims under Hawaii Revised Statutes section 514B-94 and the federal Interstate Land Sales Act, which the Court dismissed with prejudice. (Doc. No. 27 ("9/13/13 Order").) Plaintiffs timely filed a First Amended Complaint on October 11, 2013. (Doc. No. 28 ("FAC").)

Irongate filed the instant Motion to Dismiss for Failure to State a Claim on October 25, 2013. (Doc. No. 40 ("MTD").) Plaintiffs filed their memorandum in opposition on January 6, 2014, (doc. no. 50), and Irongate filed its reply on January 9, 2014. (Doc. No. 51.) A hearing on the motion was held on January 27, 2014.

---

[2/] On June 14, 2013, the Court granted the parties' joint request for a continence of the hearing on the motion to dismiss. (Doc. No. 20.) The hearing was therefore held on September 12, 2013. (Doc. No. 25.)

## FACTUAL BACKGROUND[3/]

### I.   Sales Contract

Irongate is the California-based developer of a condominium project in Honolulu called the Trump International Hotel & Tower at Waikiki Beach Walk ("Trump Waikiki"). (FAC ¶¶ 3, 6.) On around November 9, 2006, Plaintiffs Uyeshiro and Leong signed a Sales Contract with Irongate to purchase a unit in the Trump Waikiki for $837,900. (Id. ¶¶ 8, 10; see FAC Ex. A ("Sales Contract").) Only Uyeshiro initialed each page of the Sales Contract. (FAC ¶ 10.) Uyeshiro and Leong intended to use the unit for themselves and their guests and as a rental property. (Id. ¶ 9.)

The cover page of the Sales Contract that Uyeshiro and Leong signed includes the following incorporation clause:

> THE FOLLOWING DOCUMENTS THAT ARE REFERRED TO
> IN THIS SALES CONTRACT . . . FORM AN
> ESSENTIAL PART OF THIS SALES CONTRACT.
> PURCHASER ACKNOWLEDGES THAT PURCHASER HAS
> RECEIVED COPIES OF EACH OF THE FOLLOWING
> DOCUMENTS AND THAT PURCHASER HAS HAD A FULL
> AND COMPLETE OPPORTUNITY TO READ, REVIEW, AND
> EXAMINE EACH OF THE FOLLOWING
> DOCUMENTS . . . .

---

[3/] The facts as recited in this order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings. For purposes of this motion, the Court accepts as true all well-pleaded factual allegations in the Complaint, but need not accept as true allegations that contradict the Complaint's exhibits or documents incorporated by reference. See Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

(Sales Contract at 1.) The cover page then lists the nine documents that "form an essential part" of the Sales Contract, including the "Unit Maintenance and Operation Agreement" ("UMA"). (Id.) Uyeshiro initialed this provision (id.), but in fact neither Uyeshiro nor Leong had actually received a copy of the UMA; they assert that it was not finalized or did not exist at the time the Sales Contract was executed (FAC ¶ 11). They signed the Sales Contract anyway. (Id. ¶ 10.) In the following months they paid various deposits to Irongate as required by the Sales Contract, totaling $167,580. (Id. ¶ 13.)

The Sales Contract contains a recission clause, which states:

> Where, after this Sales Contract has become binding . . . there is a Material Change in the Project, Purchaser may rescind this Sales Contract within thirty (30) days of Purchaser's receipt of a copy of a Disclosure Document providing a description of the Material Change . . . . In the event Purchaser rescinds this Sales Contract pursuant to this Section D.32, Purchaser shall be entitled to a prompt and full refund of all monies paid, plus any interest earned thereon.

(Sales Contract at 23-24, § D.32.)

**I.A. References to the UMA**

Although Uyeshiro and Leong allege that they did not receive the UMA at the time they signed the Sales Contract, they apparently did receive other portions of the Sales Contract and all of the other incorporated documents (in addition to the cover

4

page discussed above) that refer to the UMA.

Both the Sales Contract and the Condominium Public

Report[4/] include the following clause describing the UMA:

> Unit Maintenance and Operation Agreement. In
> order to (i) provide for and enforce uniform
> reservation and check-in procedures for all
> [unit owners], (ii) provide for management
> and maintenance services provided by the
> owner of the Front Desk Unit to each hotel
> unit, (iii) monitor each owner's compliance
> with applicable occupancy and zoning
> requirements and condominium documents, and
> (iv) ensure that the units within the Project
> are maintained pursuant to the First Class
> Standard . . , each purchaser of a hotel unit
> will be required to execute and deliver a
> Unit Maintenance and Operation Agreement at
> closing. Unit owners shall be charged a fee
> for the services provided under such
> agreement . . . .

(Sales Contract at 33, § D.49; MTD Ex. 3 ("Pub. Rep't") at 18c,

§ 6(13).) The Public Report further explains:

> Unit Maintenance Agreement. All Hotel Unit
> Owners will be required to enter into a Unit
> Maintenance Agreement with the Front Desk
> Unit Owner . . [and] will be required to be a
> party to such Unit Maintenance Agreement for
> so long as such Owner owns a Hotel Unit, and
> no Owner shall have the right to opt out of
> receiving the services to be provided
> pursuant to the Unit Management Agreement or
> the fees, costs or charges to be paid for
> such services except as provided therein.

(Pub. Rep't at Ex. H at 3, § A.6.)

---

[4/] Both the Condominium Public Report and the Condominium
Declaration discussed below were incorporated as "essential
part[s]" of the Sales Contract by the same clause that
incorporated the UMA. (See Sales Contract at 1.)

The Condominium Declaration defines the UMA as "that agreement between each Hotel Unit Owner and the Front Desk Unit Owner, whereby the Front Desk Unit Owner shall provide housekeeping, cleaning, maintenance and inspection services for the Hotel Unit . . . ." (MTD Ex. 4 ("Condo. Decl.") at 8, § 1.B(79).) Later, the Declaration notes that the services for which unit owners may be charged pursuant to the UMA "may include, but are not limited to," front desk registration services, cleaning, mechanical maintenance, and "such other services as may be required to maintain the First Class Standard" or under the Trump Waikiki's various license and branding agreements. (Id. at 23, § VII.A.1.)

### I.B. Terms of the UMA Itself

The UMA itself - which Uyeshiro and Leong allege that they did not receive before signing the Sales Contract - explains that its purpose is to "provide for and enforce uniform reservation and check-in and check-out procedures for all unit owners." (FAC Ex. C ("UMA") at 1.) It includes the following provision describing unit owners' rental choices under the UMA:

> Hotel Unit Owner acknowledges that [it] shall be prohibited from renting [its] Hotel Unit for any period of less than [one year] unless it does so pursuant to the terms and conditions of one of Front Desk Unit Owner's standard forms of . . . (i) "Developer Sponsored Transient Rental Program Agreement"

6

> . . . or (ii) "Third Party Transient Rental
> Program Agreement."

(Id. at 2, § 3(a).) The provision also notes that the rental

management agreements may be "modified from time to time." (Id.)

The UMA also restricts unit owners' choice of vendors

for services to the unit:

> Notwithstanding a Unit Owner's absolute right
> to rent his or her Unit, to ensure the
> continuing operation of the Project as a
> resort destination operating pursuant to a
> First Class Standard, and to maintain the
> consistency of the Project, Unit Owners may
> only contract with, employ or otherwise use
> those vendors that are authorized by the
> Board . . . for providing services to a Unit
> Owner's Unit. . . . Unit Owner acknowledges
> and agrees that if a product or service is
> offered by the management company engaged to
> manage the Project, Hotel Unit Owner shall be
> required to use the product or service so
> provided in lieu of a third party
> Vendor . . . so long as the charge therefor
> is not materially higher than similar amounts
> charged by other five-star hotels in Hawaii.

(Id. at 3, § 5.)

**I.C. Sales Contract Disclaimers**

The Sales Contract and related documents contain a

number of disclaimers relating to securities laws.[5] For example,

---

[5] Plaintiffs note in their First Amended Complaint that the
Securities and Exchange Commission ("SEC") deems the offering of
condominium units for sale as an offering of securities
(triggering certain regulatory obligations) if:

> 1.   The condominiums, with any rental
> arrangement or other similar service, are offered
> and sold with emphasis on the economic benefits to
>                                        (continued...)

the Sales Contract reads:

> [Seller and/or its Agents] have made no representations: (i) regarding the possibility or probability of economic benefit from the purchase and ownership of a unit; (ii) to the effect that Seller or the managing agent of the Project will provide services relating to the rental or sale of a unit; or (iii) as to the possible advantages of the ownership or the rental of a unit under federal law and state tax laws. Neither Seller nor its Agents make any representation regarding either economic benefit to be derived from the ownership, rental or tax treatment of a unit. The tax treatment may vary with individual circumstances, and Seller and its Agents recommend that Purchaser consult Purchaser's own attorney, accountant or other tax counsel for advice regarding tax treatment. Purchaser further agrees and acknowledges that Purchaser has not been induced or solicited by Seller or its Agents to purchase the Unit in the Project as a "security" as defined under federal or state securities laws and regulations.

--------

(...continued)

> the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.
>
> 2.    The offering of participation in a rental pool arrangement; and
>
> 3.    The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

38 Fed. Reg. at 1735, 1736 (1973). The Plaintiffs assert that the securities-related disclaimers in the Sales Contract and other project documents were included for the purpose of avoiding meeting the SEC's definition of an offering of securities. (FAC ¶ 18.)

(Sales Contract at 17, § D.23.) Further, the Receipt from

Purchaser, attached to the Sales Contract and signed by Uyeshiro,

states that Irongate and its agents

> have not offered directly or indirectly a rental
> service of any kind to Purchaser or to the owners
> of condominium units in the project, either
> individually or in any form of pooling
> arrangement, or by a third party designated or
> arranged for by Seller, nor have any
> representations been made by Seller or its agents
> as to the feasibility of renting the condominium
> unit or otherwise generating income or deriving
> any other economic benefit from ownership of the
> condominium unit.

(Id., Receipt from Purchaser.)

Uyeshiro and Leong allege that these and similar

disclaimers in the Sales Contract and attached documents conveyed

to Plaintiffs that Irongate "would not materially limit their

ability to rent" the purchased unit. (FAC ¶¶ 18-20.) The

Condominium Declaration does state, however, that

> Developer, the Front Desk Unit Owner, and the
> Hotel Manager expressly disclaim any
> representations, warranties, guarantees or other
> claims of any kind regarding any rental programs
> and hereby notify any purchaser of a Hotel Unit
> that any rental program that may become available
> in which a Hotel Unit Owner might desire to
> participate will most likely place severe
> restrictions on a Hotel Unit Owner's rights to use
> said Owner's Hotel Unit, including imposing
> blackout periods or other date restrictions on use
> of the Hotel Unit that are in addition to the
> restrictions and requirements imposed by this
> Declaration.

(Condo. Decl. at 42, § XXXV.E.2.)

Uyeshiro and Leong nevertheless allege that Irongate

9

purposefully concealed its intention to impose certain restrictions on unit rentals for the purpose of avoiding triggering the registration requirements of applicable securities laws. (FAC ¶¶ 19, 21-22.) Uyeshiro and Leong allege that the UMA, the document under which Irongate intended to regulate unit rentals, did not yet exist or was not finalized at the time they signed the Sales Contract.[6] (Id. ¶ 25.)

## II.   Receipt of the Rental Management Agreements and Attempt To Rescind

In summer 2009, Uyeshiro and Leong received a letter dated June 5, 2009, from Aloha Hospitality Consulting, identifying Aloha as Irongate's rental program manager and stating that "the rental management agreements are in the final stages of revisions." (FAC ¶ 32.) Uyeshiro and Leong then received another letter from Aloha dated June 23, 2009, which enclosed copies of the "Developer Sponsored Rental Management Agreement" and the "Third Party Rental Management Agreement." (Id. ¶ 35.) As noted above, under the UMA, unit owners who wished

---

[6] Plaintiffs substantiate this claim in their First Amended Complaint by noting that all of Irongate's documents have a document number in their footer, and that the UMA document number is 515629.8, while the document numbers for the documents Plaintiffs received when they signed the Sales Contract were in the 300,000 and 400,000 range. (Id. ¶ 25.) Plaintiffs point out that Amendment 1 to the Public Report, dated August 2, 2007, has a document number of 449332.6, higher than the document numbers of the documents Plaintiffs received when they signed the Sales Contract in 2006, but lower than the document number of the UMA they received in 2011. (Id.)

to rent out their units for less than a year at a time were required to choose between these two arrangements. (See UMA at 2, § 3(a).) Since Uyeshiro and Leong had never received or read the UMA, however, this was the first time that they found out that they would be required to pick between these two rental options. (FAC ¶ 34.)

The Third Party Rental Management Agreement ("TP-RMA") notes the unit owners' restricted choice of rental management arrangements under the UMA:

> Hotel Unit owner has entered into that certain Unit Maintenance and Operation Agreement (the "Unit Maintenance Agreement") pursuant to which Hotel Unit Owner acknowledged certain terms and conditions related to the transient rental of the Hotel Unit, including the fact that Hotel Unit Owner has the right to elect to make the Hotel Unit available for rent (i) through a separate third party rental agent . . . other than Hotel Manager, (ii) through its own efforts . . . or (iii) through Hotel Manager.

(FAC Ex. D ("TP-RMA") at 2, ¶ C.)

Section 8(b) of the TP-RMA requires certain procedures for reserving units managed by a third party rental agent:

> Third Party Rental Agents shall make reservations in the same manner as all other hotel reservations for Hotel Units are booked (e.g., by telephone call to an 800 number or to the property directly, website or other similar means), and such reservations shall be processed in the manner required by the rules and regulations established by Hotel Manager; provided, however Hotel Manager may establish . . . policies and procedures for all reservations made by Hotel Unit Owner or

a Third Party Rental Agent (for example, Hotel Manager may establish special policies and procedures for the confirmation of the room rate and length of reservation for all reservations made so as to minimize any confusion between Third Party Rental Agents and Hotel Manager) . . . .

(Id. at 4, § 8(b).)

Section 9(b) requires that the rent for third-party-managed units be collected by the Trump Waikiki:

All remuneration from the rental of the Hotel Unit (less the amount of any rental deposits made through a Third Party Rental Agent or Hotel Unit Owner) will be collected through Hotel Manager upon check-out of all Transient Guests or at other times established by Hotel Manager and shall be paid by credit card, in cash or other immediately available funds. Hotel Manager shall collect and remit any sales, use, occupancy, bed, resort, tourism and/or other taxes assessed in conjunction with Hotel Manager's renting of the Hotel Unit.

(Id. at 5, § 9(b).)

Section 10(a) explains that "[o]ne hundred percent (100%) of the Unit Rental Revenue . . . generated by the Hotel Unit . . . shall be distributed to Hotel Unit Owner." (Id. at 5, § 10(a).) The "Unit Rental Revenue" does not include reservation fees and expenses paid by the Hotel Manager and Standard Hospitality Services Charges payable by the Hotel Unit Owner. (Id.) Plaintiffs allege that the conditions and requirements that the TP-RMA imposed upon third-party rentals were "significantly more oppressive than what Plaintiffs could reasonably have

12

expected based on the terms disclosed in the Sales Contract" and related documents. (FAC ¶ 42.) Plaintiffs further allege that Irongate intentionally concealed these oppressive conditions until after Plaintiffs' deposits had become non-refundable. (<u>Id.</u> ¶ 44.)

In July 2009, Irongate sent Uyeshiro and Leong documents for the closing of the sale. (<u>Id.</u> ¶ 46.) On July 15, 2009, Uyeshiro and Leong wrote to Irongate and attempted to rescind the Sales Contract. (<u>Id.</u> ¶ 47.) Irongate did not acknowledge their rescission. (<u>Id.</u>)

### III. <u>Notice of Termination</u>

On June 27, 2011, Irongate sent Uyeshiro and Leong a Notice of Termination, stating that they had defaulted under the Sales Contract. (<u>Id.</u> ¶ 48.)

On October 3, 2011, Uyeshiro and Leong sent a letter via counsel to Irongate in which they denied being in default under the Sales Contract and demanded a refund of their deposits, reimbursement for their costs, and interest. (<u>Id.</u> ¶ 49.) To date, Irongate has retained Uyeshiro and Leong's deposits. (<u>Id.</u> ¶ 50.)

### IV. <u>The Complaint</u>

On November 5, 2012, the parties entered into a tolling agreement providing that any limitations period that had not expired as of November 5, 2012, would be tolled until December 31, 2012. (MTD at 3 n.1.) Uyeshiro and Leong filed their original

Complaint on December 31, 2012, (Dkt. No. 1), and their First Amended Complaint on October 11, 2013 (Dkt. No. 28.) The First Amended Complaint asserts causes of action for: (1) unjust enrichment; (2) breach of contract; (3) violation of HRS Chapter 480 (Unfair and Deceptive Trade Practices); (4) violation of HRS Chapter 480 (Unfair Methods of Competition); and (5) fraudulent misrepresentation.

## STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011).

On a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the nonmoving party. Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012) (citation omitted). Nonetheless, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." Fayer v. Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011) (citations omitted). "[O]nly pleaded facts, as opposed to legal conclusions, are entitled to assumption of the truth." United

States v. Corinthian Colls., 655 F.3d 984, 991 (9th Cir. 2011) (citation omitted). A "formulaic recitation of the elements of a cause of action" will not defeat a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted). The complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

The Court may, but is not required to, "consider certain materials — documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice — without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003); see Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1159-60 (9th Cir. 2012) (court not required to incorporate documents by reference). The Court may also consider documents whose contents are alleged in a complaint and whose authenticity is not questioned by any party. Davis, 691 F.3d at 1160. The Court need not accept as true allegations that contradict the complaint's exhibits, documents incorporated by reference, or matters properly subject to judicial notice. Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

The Court should grant leave to amend "even if no request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts." <u>OSU Student Alliance v. Ray</u>, 699 F.3d 1053, 1079 (9th Cir. 2012). Leave to amend "is properly denied, however, if amendment would be futile." <u>Carrico v. City & County of S.F.</u>, 656 F.3d 1002, 1008 (9th Cir. 2011).

### **DISCUSSION**

### I.   **Unjust Enrichment**

The Plaintiffs' first claim is for unjust enrichment. Irongate argues that this claim must fail because the Sales Contract is binding. Under Hawaii law, the elements of an unjust enrichment claim are that: (1) the plaintiff conferred a benefit on the defendant by adding to the defendant's security or advantage; and (2) the retention of that benefit by the defendant was unjust. <u>Durette v. Aloha Plastic Recycling, Inc.</u>, 100 P.3d 60,74 (Haw. 2004).

As to the first element, Uyeshiro and Leong allege that they paid Irongate $167,580 in deposits under the Sales Contract. (FAC at ¶ 52.) As to the second element, they assert that Irongate's retention of the deposits is unjust because the Sales Contract is void due to the absence of mutual assent. (<u>Id.</u> ¶ 54.) It is axiomatic that "there must be a meeting of the minds on all essential elements or terms in order to create a binding

16

contract." <u>United Public Workers, AFSCME v. Dawson Int'l</u>, 149 P.3d 495, 509 (Haw. 2006) (citation omitted). Plaintiffs argue that there was no "meeting of the minds," or mutual assent, here because (1) the terms of the UMA, incorporated by reference into the Sales Contract, were not provided to Plaintiffs or did not exist at the time Plaintiffs executed the Sales Contract, and (2) Irongate attempted to incorporate the rental management agreements into the Sales Contract and rendered the contract unenforceable by reserving the right to make modifications to the rental management agreements. (Opp'n at 17.)

As to the Plaintiffs' argument that there was no mutual assent because they were not provided a copy of the UMA at the time they signed the Sales Contract, it is unavailing. It is well-settled under Hawaii law and as a general common law principle that a signatory to a contract who does not read the entire contract before signing it is nonetheless still bound by it. <u>See, e.g.</u>, <u>Courbat v. Dahana Ranch, Inc.</u>, 141 P.3d 427, 437 (Haw. 2006) ("The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained.") (quoting <u>Leong v. Kaiser Found. Hosps.</u>, 788 P.2d 164, 168 (Haw. 1990)). Further, as this Court stated in its 9/13/13 Order, while there appear to be no Hawaii cases addressing this situation, courts applying the common law of other jurisdictions have uniformly

found that a signatory to a contract who is on notice that his copy of the contract is incomplete, but signs it anyway, is bound by the full contract. (See 9/13/13 Order at 14-16 (citing cases).)

The allegations in the First Amended Complaint and its exhibits demonstrate that Uyeshiro and Leong were on notice when they signed the Sales Contract that they had not received a complete copy of the entire agreement. The first page of the Sales Contract, which Uyeshiro initialed, stated that the UMA was an "essential part" of the contract, and the Sales Contract stated in a number of other places that Plaintiffs were required to enter into the UMA as a part of the Sales Contract and could not opt out. (Sales Contract at 1, 33; Pub. Rep't at 18c & Ex. H; Condo. Decl. at 18; FAC ¶¶ 11, 23.) Indeed, the first page of the Sales Contract expressly states in all capitalized letters that "purchaser has had a full and complete opportunity to read, review and examine" the UMA. (Sales Contract at 1.) Nevertheless, Uyeshiro and Leong signed the Sales Contract without asking for or obtaining a copy of the UMA.

Plaintiffs do not allege that Irongate willfully withheld the UMA from them, discouraged them from asking for it, or otherwise thwarted their efforts to review it prior to signing the Sales Contract. As such, to the extent the UMA existed at the time, the Plaintiffs cannot now argue that they are not bound by

its terms because it was not provided to them when they signed the Sales Contract. See, e.g., Pinto v. Walt Disney Parks & Resorts U.S., Inc., Civ. No. 11-56781, 2013 WL 2460284, at *2 (9th Cir. June 7, 2013) (under California law, where "Appellants claim they did not receive the full . . . agreement at signing" and provided no evidence that they were deceived or misled into signing the agreement, "Appellants should have learned the terms of the . . . agreement before (or after) signing the agreement, or should not have signed the agreement in the first place.").

Uyeshiro and Leong also assert, however, that there could not have been mutual assent because the UMA, an essential part of the Sales Contract, did not exist at the time that the Sales Contract was executed. (See Opp'n at 19-20; FAC ¶ 55.) Plaintiffs note that the Sales Contract states that the UMA is an "essential part" of the Sales Contract, and argue that it could not have been incorporated by reference, and Plaintiffs could not have agreed to its terms, when it did not exist. They purport to support their allegation that the UMA did not exist at the time the Sales Contract was signed by noting that the document number on the copy of the UMA they received in 2011 is higher than the document numbers on the documents they received in 2006 and 2007, indicating that it was drafted after the project documents they received at the time they signed the Sales Contract in 2006. (See FAC ¶ 25.) Specifically, Plaintiffs note that Amendment 1 to the

19

Public Report, dated August 2, 2007, has a document number of 449332.6, higher than the document numbers of the documents Plaintiffs received when they signed the Sales Contract in 2006, but lower than the document number (515629.8) of the UMA they received in 2011. (<u>Id.</u>)

  Generally, under Hawaii law, in order to effectively incorporate by reference a separate document into a contract, "the reference must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the contracting parties." <u>Safeway, Inc. v. Nordic PCL Const., Inc.</u>, 312 P.3d 1224, 1234 (Haw. Ct. App. 2013) (quoting 17A C.J.S. Contracts § 402 (internal quotation marks and alterations omitted)). Courts in other jurisdictions have held as a general matter that a contract cannot effectively incorporate a document that does not yet exist. <u>See</u> <u>Bricklayers, Masons and Plasterers Intern. Union of America, Local Union No. 15, Orlando, Fl. v. Stuart Plastering Co., Inc.</u>, 512 F.2d 1017, 1029 (5th Cir. 1975) (stating, in the context of a labor contract, that "an instrument may incorporate by reference only the terms of an instrument already in existence"); <u>Gilbert Street Developers, LLC v. La Quinta Homes, LLC</u>, 174 Cal. App. 4th 1185, 1194 (Cal. Ct. App. 2009) (stating, in the context of incorporation by reference of potential future arbitration rules, "what is being incorporated must actually exist at the time of the incorporation, so the

parties can know exactly what they are incorporating." (emphasis omitted)).

Here, Uyeshiro and Leong allege that the UMA did not exist at the time they executed the Sales Contract. (FAC ¶¶ 9, 25.) For purposes of the instant motion to dismiss, the Court must take this allegation as true.[7] See Iqbal, 556 U.S. at 678; Sateriale, 697 F.3d at 783. To the extent the UMA did not exist at the time, it was not "easily available" when the parties signed the Sales Contract and, thus, could not be incorporated by reference. See Safeway, 312 P.3d at 1234. Further, if there was no incorporation of the UMA, this "essential" part of the Sales Contract was missing, and there could thus be no mutual assent to all of the essential terms of the contract. Absent mutual assent to all of the Sales Contract's essential terms, no binding contract exists.[8] See Madeja v. Olympic Packer, LLC, 155 F.

---

[7] At the hearing on the instant motion, Irongate's counsel argued that the UMA was in existence in 2006 when Plaintiffs signed the Sales Contract, and that the Plaintiffs probably received an amended UMA in 2011 (which arguably did not include any material changes). While Irongate's counsel's assertions may, in fact, be correct, this Court in considering the instant motion to dismiss is nonetheless constrained by the rule that it must accept the allegations in the First Amended Complaint as true.

[8] The Court notes that Uyeshiro and Leong also argue that the Sales Contract is void based on a lack of mutual assent because the terms of the rental management agreements were not ascertainable at the time the Sales Contract was executed. This argument is unavailing because, as the Court stated in its 9/13/13 Order, the rental management agreements are not a part of the Sales Contract. (See 9/13/13 Order at 18 n.5.) Thus, even if
(continued...)

21

Supp. 2d 1183, 1209 (D. Haw. 2001) (citing <u>Carson v. Saito</u>, 53 Haw. 178, 182 (1971)). For purposes of the instant motion, Plaintiffs have therefore stated a claim for unjust enrichment.[9] As such, the Court DENIES Irongate's motion with respect to this claim.

**II.   <u>Breach of Contract</u>**

Uyeshiro and Leong's second claim is a claim for breach of contract premised upon their assertions that (1) Irongate failed to honor their contractual right to rescind the Sales Contract, and (2) Irongate breached the implied covenant of good faith and fair dealing by "imposing oppressive conditions and requirement[s] on the third-party rental of" Plaintiffs' unit. (Opp'n at 25.) The breach of contract claim is pled in the alternative to the unjust enrichment claim and, to the extent the Plaintiffs state a claim for unjust enrichment based on their allegation that the Sales Contract is void due to a lack of mutual assent (as discussed above), this claim appears to be

---

[8] (...continued) the rental management agreements were unenforceable based on a lack of mutual assent, that would not render the Sales Contract itself unenforceable.

[9] The Court notes that, to the extent Irongate can demonstrate that the UMA did, in fact, exist at the time the Plaintiffs signed the Sales Contract, Plaintiffs' claim for unjust enrichment is unlikely to survive a motion for summary judgment. Based on the materials before the Court at this time, however, Plaintiffs have made sufficient allegations to survive the instant motion to dismiss.

moot. Regardless, the Court finds that, even assuming the Sales Contract is valid, the Plaintiffs fail to state a viable claim for breach of contract.

### A.   The Plaintiffs' Right to Rescind

First, Uyeshiro and Leong argue that the rental management agreement, in particular the Third Party Transient Rental Program Agreement ("TP-RMA"), constituted a material change under to the Sales Contract's rescission clause. (FAC ¶¶ 64-67.) They allege that they sought to exercise their right to rescind the Sales Contract on July 15, 2009, within thirty days of receiving their copy of the TP-RMA, but that Irongate has refused to honor their rescission and is thus in breach of contract. (Id. ¶¶ 68-70.) Irongate argues in the instant motion that the TP-RMA does not constitute a material change and, thus, Plaintiffs have failed to state a viable breach of contract claim. (MTD at 19.)

Section D.32 of the Sales Contract provides that the purchaser may rescind the Sales Contract within thirty days if there is a "Material Change" in the project after the Sales Contract becomes binding. (Sales Contract at 23, § D.32.) The Sales Contract defines a "Material Change" as a change in the project which "(1) directly, substantially, and adversely affects the use or value of the Unit or the Limited Common Elements appurtenant thereto or the amenities of the Project available for

Purchaser's use and (2) not made pursuant to a right reserved to the Seller under the Declaration." (Id., Ex. A at 2.)

Uyeshiro and Leong argue that the TP-RMA constitutes such a material change in the project. Specifically, they argue that, based on the project documents they had at the time they signed the Sales Contract, they reasonably expected that Irongate would not materially limit their ability to rent out their unit. (MTD at 29.) The terms of the TP-RMA are, in their view, far more onerous than what they reasonably expected based on the Sales Contract. Specifically, the Plaintiffs point to the fact that the TP-RMA requires that all rental revenues be collected by the Front Desk Unit prior to being remitted to any third-party rental agent, and note that, under the terms of the Sales Contract, a third-party rental agent may have to wait up to two months before collecting rental revenue. (Opp'n at 12.) Plaintiffs further argue that the collection of check-in and reservation information provides Irongate with proprietary data on room rates for units it does not manage. (Id. at 13.) Plaintiffs emphasize that these provisions "essentially reduced the role of Third-Party Rental Agents to the point of irrelevance." (Id. at 11.)

Although the determination of whether there is a material change is typically a question of fact, here the documents demonstrate on their face that the TP-RMA is wholly consistent with the Sales Contract and incorporated documents. As

this Court stated in its 9/13/13 Order, because the TP-RMA is consistent with the disclosures in the Sales Contract, it does not represent a material change in the project. (See 9/13/13/ Order at 19-21.) Neither the terms of the TP-RMA nor those of the Sales Contract and other project documents have changed since this Court's 9/13/13 Order. As the Court stated in that Order, the Sales Contract itself makes clear that all unit owners will be required to use uniform reservation and check-in procedures when renting their units, that the Front Desk Unit Owner will provide "management and maintenance services" for each unit, and that unit owners will be charged a fee for these services. (Sales contract at 33, § D.49.) The Sales Contract and the project documents also make clear that unit owners will be required to use the hotel's guest registration system. (Id.; Pub. Rep't at 18c, § 6(13); Condo. Decl. at 23, § VII.A.1.)

       The Condominium Declaration states that the Front Desk Unit Owner will determine the standard hospitality services necessary to provide all "[o]wners, guests, [and] transient renters" with "a uniform, resort-like experience" in keeping with the so-called "First Class Standard." (Condo. Decl. at 23, § VII.A.1.) The Public Report states that "no Owner shall have the right to opt out of receiving the services to be provided [by the Front Desk Unit Owner] pursuant to the Unit Management Agreement." (Pub. Rep't at Ex. H at 3, § A.6.)

25

Further, the securities-related disclosures that Plaintiffs claim led them to believe that their ability to rent their unit would not be curbed appear to be relatively standard disclosures often included in these types of sales contracts. See, e.g., Altenel, Inc. v. Millennium Partners, LLC, 947 F. Supp. 2d 1357, 1369 (S.D. Fl. 2013) (involving a condominium purchase agreement with disclaimers stating that the developer had not made any representations regarding current or future rental income or the developer's role in assisting the purchaser in renting the unit, where the developer nevertheless did institute a rental program thereafter); Salameh v. Tarsadia Hotels, Civ. No. 09-2739, 2010 WL 3339439, at *3 (S.D. Cal. Aug. 24, 2010), aff'd 726 F.3d 1124 (9th Cir. 2013) (same). The Plaintiffs themselves assert that Leong is "familiar with the customs and practices of the hospitality industry" and "advised Outrigger Hotels Hawaii while in private practice, and then while serving as Senior Vice President and Chief Legal Officer of Outrigger Enterprises, Inc. (the general partner of Outrigger Hotels Hawaii) - positions she held at the time the Sales Contract was executed." (Opp'n at 16 & n.5; FAC ¶ 20.) In light of Leong's assertions regarding her considerable business experience, it appears she was a sophisticated purchaser and should have been familiar with such disclosure practices. (See FAC ¶ 20.)

26

Regardless, numerous provisions in the Sales Contract and incorporated project documents clearly contemplated certain restrictions and requirements applicable to short-term rentals of condominium units. Indeed, the Condominium Declaration expressly stated that "any rental program that may become available . . . will most likely place severe restrictions on a Hotel Unit Owner's rights to use said Owner's Hotel Unit . . . ." (Condo. Decl. at 42, § XXXV.E.2.) Further, the rental provisions are all consistent with the explicit positioning of the condominium units in the project as "hotel units" throughout the Sales Contract and incorporated project documents. (See, e.g., Sales Contract at 9, § D.1; Pub. Rep't at 6, §1.13; Condo. Decl. at 42, § XXXV.E.2.) The requirements in the TP-RMA that all rental reservations, check-ins, and check-outs go through the Front Desk Unit Owner, including the requirement that the Front Desk collect rental payments before disbursing them to unit owners or third-party rental agents, are contemplated by and entirely consistent with the Sales Contract documents, even absent the Court's consideration of the UMA. To the extent these requirements diminish the role of third-party rental agents, this is the arrangement the Plaintiffs bargained for when they signed the Sales Contract.

This situation is markedly different from those in the cases Uyeshiro and Leong cite in support of their argument. For

27

example, in <u>Goldberg v. 401 N. Wabash Venture LLC</u>, the seller amended certain project documents, namely, the property report, after the plaintiff had signed a sales contract. 904 F. Supp. 2d 820, 844-46 (N.D. Ill. 2012). The changes to the property report included switching the status of the property's meeting rooms and ballrooms from common elements that would generate revenue for condominium owners, to commercial units that the developer would own entirely and collect all revenue from. In light of the those and other substantial changes to the project documents, the <u>Goldberg</u> court found that the plaintiff had raised a genuine issue of fact as to whether the defendant misrepresented material information, and that the materiality of the loss of revenue was a question of fact for the jury. <u>Id.</u> at 846-47. Here, conversely, Uyeshiro and Leong have presented no evidence that the TP-RMA altered the Sales Contract at all. Indeed, as discussed above and in this Court's 9/13/13 Order, the TP-RMA was entirely consistent with the Sales Contract.

The Court is therefore not obliged to accept as true Uyeshiro and Leong's legal conclusion that the provisions of the TP-RMA constituted a material change in the condominium project. <u>See</u> <u>Lazy Y Ranch</u>, 546 P.3d at 588. The First Amended Complaint does not present facts sufficient to support a claim for breach of contract based on Irongate's refusal to honor Plaintiffs' attempt to rescind the Sales Contract. This claim is therefore

DISMISSED WITHOUT PREJUDICE.

**B.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

Uyeshiro and Leong also argue that Irongate breached the implied covenant of good faith and fair dealing by imposing "oppressive conditions" on third-party rentals and concealing those conditions until after the Sales Contract was executed. (FAC ¶ 71.)

As Plaintiffs correctly point out, "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." Best Place, Inc. v. Penn Am. Ins. Co., 82 Haw. 120, 123-24 (1996). Plaintiffs argue that, because Irongate had discretion to establish the terms of the TP-RMA, the implied covenant of good faith and fair dealing required it to exercise that discretion in keeping with the Plaintiffs' reasonable expectations based on the Sales Contract. (Opp'n at 26.)

As discussed above and in this Court's 9/13/13 Order, however, the TP-RMA was entirely consistent with the Sales Contract and project documents (even excluding any consideration of the UMA). Where a contract provides one party with the discretion to act, that party does not violate its duty of good faith and fair dealing when it acts in a manner consistent with the contract. See Hawaii Leasing v. Klein, 698 P.2d 309, 313

(Haw. App. 1985) (noting that parties have a duty of good faith and fair dealing in performing contractual obligations, and that such good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." (citing Restatement (Second) of Contracts § 205, cmt. a)); BJC Health System v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007) ("To establish a violation of the covenant of good faith and fair dealing . . . the plaintiff must show that the party exercised its discretion in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract." (citations and internal quotation marks omitted)).

The project documents make clear that unit owners who wish to rent out their units for less than one year will be subject to certain requirements, including the requirements that all renters check in and out with the Front Desk Unit Owner, and that all unit owners participate in the Standard Hospitality Services offered by the Front Desk Unit Owner. (Pub. Rep't at 18c, § 6.12, Ex. H at 3-4.) The provisions of the TP-RMA addressing the collection of payments from guests, the confirmation of room reservations and lengths of stay, and the standardization of hospitality services are consistent with the provisions of the Sales Contract and incorporated documents, as well as the Sales Contract's characterization of the condominium

units as "hotel units" in a "resort destination operating pursuant to the First Class Standard." (See, e.g., Sales Contract at 9, § D.1; Pub. Rep't at 18b, § 6.9; Condo. Decl. at 23, § VII.A.1.) They therefore do not appear to be aimed at "evading the spirit" of the Sales Contract.

As such, Plaintiffs' breach of contract claim premised upon a breach of the implied covenant of good faith and fair dealing is DISMISSED WITHOUT PREJUDICE.

### III.  Unfair and Deceptive Trade Practices

The Plaintiffs' third claim is for unfair and deceptive trade practices under Hawaii Revised Statutes § 480-13. The elements of such a claim are: (1) a violation of Chapter 480-2; (2) injury to the plaintiff; and (3) damages. Isagawa v. Homestreet Bank, 769 F. Supp. 2d 1225, 1236-37 (D. Haw. 2011). Uyeshiro and Leong's claim is based on Irongate's alleged imposition of oppressive conditions on third-party rentals which it concealed and did not disclose until after the Sales Contract had been signed. (FAC ¶¶ 78-80.)

Irongate argues that this claim is time-barred. The applicable statute of limitations is four years from the time of the violation. Haw. Rev. Stat. § 480-24(a). The discovery rule does not apply to claims under section 480-13. See Kersh v. Manulife Fin. Corp., 792 F. Supp. 2d 1111, 1122 (D. Haw. 2011). As such, the four-year period begins to run from the date of the

occurrence of the violation, and not the date of the discovery. McDevitt v. Guenther, 522 F. Supp. 2d 1272, 1289 (D. Haw. 2007) (finding that plaintiff's cause of action occurred when the prenuptial agreement he claimed was drafted in a fraudulent manner was drafted). Here, Uyeshiro and Leong claim that "Irongate made disclaimers and representations in the Sales Contract and Project Documents that led Plaintiffs to reasonably believe that their ability to rent Unit 805 was not materially limited . . . ." (FAC § 80.) These "disclaimers and representations" apparently refer to the securities-related disclaimers in the Sales Contract and other project documents. Because these allegedly deceptive statements were made in the Sales Contract, the four-year limitations period begins to run from the date of the "occurrence," or November 9, 2006, the date on which the Plaintiffs signed the Sales Contract.

Uyeshiro and Leong argue, however, that the statute of limitations should be tolled due to Irongate's fraudulent concealment. (Opp'n at 29-30.) To qualify as fraudulent concealment, the liable party's acts "must be of an affirmative character and fraudulent," and must be taken "to conceal a known cause of action." Au v. Au, 626 P.2d 173, 178 (Haw. 1981). Moreover, the circumstances constituting fraudulent concealment must be pled with particularity under Federal Rule of Civil Procedure 9(b). 389 Orange St. Ptrs. v. Arnold, 179 F.3d 656, 662

32

(9th Cir. 1999).

Here, as was the case with Plaintiffs' original complaint, the First Amended Complaint fails to allege with particularity any facts - as opposed to legal conclusions - demonstrating that Irongate undertook affirmative acts with the intent to conceal the existence of Plaintiffs' cause of action. Specifically, the First Amended Complaint alleges that Irongate "made disclaimers and representations in the Sales Contract and Project Documents that led Plaintiffs to reasonably believe that their ability to rent Unit 805 [would] not [be] materially limited . . . ." (FAC ¶ 80.) Uyeshiro and Leong essentially argue that the disclaimers and representations related to securities laws in the Sales Contract misled them into believing that they would be able to rent out their unit without any restrictions. Those disclaimers, however, merely state that Irongate did not sell condominium units based on promises related to expected profits under a developer-sponsored rental program. (See Sales Contract at 17, § D.23 (stating that the seller has made no representations "regarding the possibility or probability of economic benefit from the purchase and ownership of a unit," "to the effect that Seller . . . will provide services relating to the rental or sale of a unit," or "as to the possible advantages of the ownership or the rental of a unit under federal law and state tax law.") They do not, as Plaintiffs assert, state that

Irongate will not establish rules and regulations applicable to unit owners who wish to rent out their condominium units.

Indeed, the Sales Contract and incorporated documents expressly contemplate such restrictions. The securities-related disclaimer itself in the Condominium Declaration states that "any rental program that may become available in which a Hotel Unit Owner might desire to participate will most likely place severe restrictions on a Hotel Unit Owner's rights to use said Owner's Hotel Unit . . . ." (Condo. Decl. at 42, § XXXV.E.2.) Further, as discussed above, the Sales Contract and other project documents repeatedly make clear that all unit owners who wish to rent out their units will be required to use uniform reservation and check-in procedures and Standard Hospitality Services. (Sales Contract at 33, § D.49; Pub. Rep't at 18c, § 6.12-13; Condo. Decl. at 23, § VII.A.1.) As this Court stated in its 9/13/13 Order, Uyeshiro and Leong do not allege that Irongate concealed either the existence of these rental requirements or their mandatory nature.

In sum, the allegations in the First Amended Complaint are insufficient to support a finding of fraudulent concealment. The four-year statute of limitations on this claim began to run in November 2006. Uyeshiro and Leong did not file their complaint until six years later, and have not alleged specific facts that would justify tolling of the statute of limitations. This claim

34

is therefore DISMISSED WITHOUT PREJUDICE.

## IV.  Unfair Methods of Competition

The Plaintiffs' fourth claim is for unfair methods of competition under Hawaii Revised Statutes § 480-2(e). The elements of such a cause of action are: "(1) a violation of HRS chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages." Davis v. Four Seasons Hotel Ltd., 122 Haw. 423, 435 (Haw. 2010). Irongate argues that Uyeshiro and Leong's claim for unfair methods of competition is time-barred and, alternatively, fails because the Plaintiffs' lack standing under the statute.

As discussed above, claims under Hawaii Revised Statutes Chapter 480 are governed by a four-year statute of limitations. Haw. Rev. Stat. § 480-24(a). The conduct at issue here occurred in November of 2006, when Uyeshiro and Leong executed the Sales Contract. Uyeshiro and Leong did not file their complaint until six years later and, as such, it appears to be untimely. The Plaintiffs argue again, however, that the statute of limitations should be tolled due to Irongate's fraudulent concealment. As discussed above, however, Uyeshiro and Leong have failed to allege with particularity specific acts undertaken by Irongate for the purpose of concealing the requirements and restrictions applicable to the rental of condominium units. They have therefore failed to allege facts

35

that would justify tolling of the statute of limitations, and
their claim for unfair methods of competition is thus untimely.
Plaintiffs' fourth claim for relief is therefore DISMISSED
WITHOUT PREJUDICE.

## V.    Fraudulent Misrepresentation

　　　　Uyeshiro and Leong's final claim is for fraudulent
misrepresentation. To succeed on a fraudulent misrepresentation
claim, a plaintiff must show that "(1) false representations were
made by defendants; (2) with knowledge of their falsity (or
without knowledge of their truth or falsity); (3) in
contemplation of plaintiff's reliance upon these false
representations; and (4) plaintiff did rely upon them." Ass'n of
Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs. v.
Venture 15, Inc., 115 Haw. 232, 263 (Haw. 2007) (quoting Shoppe
v. Gucci Am., Inc., 94 Haw. 368, 386 (Haw. 2000)). Fraudulent
misrepresentation claims are subject to the heightened pleading
requirements under Rule 9(b). See, e.g., Radford v. Wells Fargo
Bank, Civil No. 10-00767 SOM-KSC, 2011 WL 1833020, *7 (D. Haw.
May 13, 2011) (applying Rule 9(b) to a plaintiff's fraudulent
misrepresentation claim).

　　　　Here, Uyeshiro and Leong allege that Irongate
intentionally and falsely represented that they would have "an
absolute right, without obtaining the consent or joinder of any
other Unit Owners, and subject only to the provisions of the

Condominium Property Act, the Declaration, and the Bylaws, to lease Unit 805," and that "[t]he sale of Unit 805 was separate from management of that Unit." (FAC ¶ 93 (citing Pub. Rep't, Ex. H; Sales Contract § D.23).)

With respect to the first representation, it does not appear to be misleading or otherwise false. The Public Report, the document Plaintiffs claim contains this misleading statement, expressly states:

> Notwithstanding a Hotel Unit Owner's absolute right to lease his or her Hotel Unit, to ensure the continuing operation of the Project as a resort destination operating pursuant to the First Class Standard, and to maintain the consistency of services offered at the Project, Owners may only rent their Hotel Units through a rental agent authorized by the Board.

(Pub. Rep't, Ex. H at 3.) Further, the Public Report and Sales Contract both state that all unit owners will be required to enter into a UMA with the Front Desk Unit Owner, providing for, among other things, uniform reservation and check-in procedures. (Id.; see also Sales Contract at 33, § D.49.) The Condominium Declaration, in turn, makes clear that the Front Desk Unit Owner will provide certain mandatory hospitality services to owners who wish to rent out their units, including, among other things, front desk registration services. (Condo. Decl. at 23, § VII.A.1.) The Condominium Declaration also expressly states that "any rental program that may become available in which a Hotel Unit Owner might desire to participate will most likely place

37

severe restrictions on a Hotel Unit Owner's rights to use said Owner's Hotel Unit . . . ." (Id. at 42, § XXXV.E.2.) The Public Report states that "[t]he rental of the Hotel Units shall be accomplished in a manner that provides the benefit of rental to Owners while at the same time reducing any disruption to the use and enjoyment of other Hotel Units and the Project . . . ." (Pub. Rep't at 4.) In sum, the Sales Contract and incorporated documents expressly contemplate the standardization of unit rentals through the imposition of certain mandatory services that all unit owners wishing to rent out their units must receive.

In light of these provisions, it appears the Sales Contract and incorporated project documents make clear that, while unit owners are free to rent out their units to whomever they choose without obtaining the permission of other unit owners, rentals will nevertheless be subject to certain restrictions and requirements aimed at "provid[ing] for and enforc[ing] uniform reservation and check-in procedures" and ensuring that "the units within the Project are maintained pursuant to the First Class Standard." (Sales Contract at 33, § D.49.)

As to the second allegedly false representation, that Irongate falsely stated that the sale of Plaintiffs' condominium unit "was separate from the management of that Unit, as required to avoid subjecting the sale of Unit 805 to regulation by federal

and state securities laws," this allegation is likewise insufficient to support a claim for fraudulent misrepresentation. The disclaimers Plaintiffs complain of state that Irongate makes no representations "regarding the possibility or probability of economic benefit from the purchase and ownership of a unit," "to the effect that [it] will provide services relating to the rental or sale of a unit," or "as to the possible advantages of the ownership or rental of a unit under federal law or state tax laws." (Sales Contract at 17, § 23(a); Pub. Rep't at 18b, § 10.)

Uyeshiro and Leong appear to argue that these statements were misleading in that they gave the impression that the Plaintiffs would be allowed to rent out their unit without restrictions. (Opp'n at 37.) As this Court discussed in its 9/13/13 Order and above, however, the Sales Contract and incorporated project documents made clear that there would be certain restrictions and regulations pertaining to unit rentals. For example, the securities-related disclaimer itself in the Condominium Declaration expressly notifies prospective buyers that "any rental program that may become available in which a Hotel Unit Owner might desire to participate will most likely place severe restrictions on a Hotel Unit Owner's rights to use said Owner's Hotel Unit . . . ." (Condo. Decl. at 42, § XXXV.E.2.) As discussed above, provisions in the other project documents similarly made clear that owners wishing to rent out

39

their units will be subject to certain requirements in order to maintain the so-called "First Class Standard." (See, e.g., Sales Contract at 33, § D.49; Condo. Decl. at 23, § VII.A.1; Public Report, Ex. H at 3.)

In sum, Uyeshiro and Leong have failed to allege facts sufficient to support a claim for fraudulent misrepresentation. This claim is therefore DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Irongate's Motion to Dismiss (Dkt. No. 40). The Court DENIES the motion as to Plaintiffs' claim for unjust enrichment. The Court GRANTS the motion as to the remaining claims[10] in the First Amended Complaint; those claims are DISMISSED WITHOUT PREJUDICE. Plaintiffs must file any further amended complaint within thirty days or judgment will be entered against them and this action will be closed. The Court notes that this will be Plaintiffs' second opportunity to amend their complaint. Any further amended complaint must correct all the deficiencies noted in this Order or Plaintiffs' claims will be

---

[10] The Plaintiffs' second claim for relief, a claim for breach of contract, is pled in the alternative to the Plaintiffs' claim for unjust enrichment. To the extent the Plaintiffs state a claim for unjust enrichment based on their allegation that the Sales Contract is void due to a lack of mutual assent, the breach of contract claim appears to be moot. Regardless, the Court finds that, even assuming the Sales Contract is valid, the Plaintiffs fail to state a viable claim for breach of contract.

dismissed with prejudice.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 3, 2014.



_____
Alan C. Kay
Sr. United States District Judge

Uyeshiro et al. v. Irongate Azrep BW LLC, Civ. No. 13-00043 ACK BMK, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss.

41